IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMCOR FACILITIES SERVICES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> IFS NORTH AMERICA, INC., <br><br> Defendant. | CASE NO.  24-cv-770 |

# COMPLAINT

EMCOR Facilities Services, Inc. ("EFS" or "Plaintiff") hereby asserts the following claims for Fraudulent Inducement, Breach of Contract, and Declaratory Judgment against Defendant IFS North America, Inc. ("IFS" or "Defendant"), and alleges as follows:

## SUMMARY OF DISPUTE

1. This dispute centers on IFS's failure to deliver a working software solution to EFS despite IFS's repeated representations that it had the capabilities to provide such a software solution that fit EFS's needs. After paying millions of dollars to IFS and providing thousands of hours of support to IFS over the course of three years, EFS never received a fully-functioning software solution, damaging EFS in excess of $9.6 million.

2. EFS is a premier facilities management company that takes pride in offering its customers state-of-the-art facilities management and services. It identified a need to upgrade its prior software platforms, eventually turning to IFS to help deliver such a service. Through a competitive bidding process, IFS—which marketed itself as a global enterprise solution software provider—was chosen based on its representations that it could fulfill the requirements set forth by EFS and its customers, including that the software be functional on tablets and smartphones.

1

IFS specifically represented that tablet and smartphone functionality came "standard" with its services.

3. Specifically, EFS contracted with IFS to develop and deploy an enterprise-level software solution that would allow EFS to consolidate its existing disparate service application modules into a new single platform offered by IFS (the "IFS System").

4. Despite the large amounts paid by EFS to IFS in addition to the large amount of money spent by EFS internally to work with IFS, IFS's promised software solution had, at best, only minimal functionality for only a few of EFS's customers, and no functionality for the vast majority of EFS's customers. Egregiously, this included a lack of smartphone and tablet functionality—key to EFS's operations—despite IFS's express representations that such functionality would be included as "standard." The substantial lack of functionality significantly impacted EFS's ability to effectively deploy the IFS System to EFS's customers, internal service technicians, and external subcontractors, the majority of whom heavily relied on and completed their work on smartphones and tablets.

5. In addition, the IFS System failed to function with respect to customer data loading. During the bidding and subsequent implementation period, EFS repeatedly communicated to IFS that the majority of EFS's business fell into the multi-site model (*i.e.*, customers with a high volume of locations across the country). Despite it being a key functionality needed by EFS, IFS made its first attempt to load multi-site customer information into the IFS System more than three years into the implementation process. This attempt immediately failed, and IFS confirmed that the IFS System did not have the capacity to handle the contractual volume that EFS's multi-site customers presented—despite IFS having represented it had such capabilities from day one. IFS later admitted that its recommended framework for contract line creation was never suitable to handle the volume of data needed for EFS's multi-site customers.

6. As a result of these issues, EFS had little to show for its relationship with IFS: three years into the implementation process, only approximately twelve percent of EFS's workforce could utilize—on a partially functional platform—the IFS System. In short, IFS never delivered

2

what it had promised. Accordingly, EFS now asserts claims against IFS for Fraudulent Inducement, Breach of Contract, and Declaratory Relief.

## THE PARTIES

7. EFS is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 9655 Reading Road, Cincinnati, Ohio 45215. EFS is a citizen of Ohio.

8. On information and belief, IFS is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business at 300 Park Boulevard, Itasca, Illinois 60143. IFS is a citizen of Wisconsin and Illinois.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over the matters asserted herein under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 exclusive of interest and costs and the parties are citizens of different states.

10. IFS is subject to this Court's personal jurisdiction as its principal place of business is in this District.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because IFS's principal place of business is in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Parties

12. EFS is a premier facilities management company, servicing over 80,000 facilities from commercial office space and manufacturing to retail portfolios and providing mobile services to thousands more—totaling over one billion square feet of facilities space for the nation's leading companies and organizations. EFS provides comprehensive facilities solutions by offering everything from mechanical and electrical maintenance to energy management and building services. EFS effectively optimizes the operations of its customers' facilities, enhancing productivity and reducing operational costs. In connection with providing these facilities services,

EFS employs over 300 customer service representatives and 2,000 technicians, and it has a network of approximately 9,500 subcontractors.

13. IFS purports to be a sophisticated, global enterprise software solution provider with hundreds of partners and thousands of customers worldwide. IFS markets itself as "develop[ing] and deliver[ing] cloud enterprise software for companies around the world who manufacture and distribute goods, build and maintain assets, and manage service-focused operations." It further advertises: "Within our single platform, our industry specific products are innately connected to a single data model and use embedded digital innovation so that our customers can be their best when it really matters to their customers – at the Moment of Service™."

### EFS's Selection of IFS

14. In order to improve efficiency and facilitate a better customer experience, EFS sought to upgrade its software system and implement a single-platform, enterprise level software system that could be used by its customers, employees, and subcontractors. EFS specifically wanted to eliminate the use of the separate portals that had been in use since at least 2013 for receiving work orders, assigning work orders, and performing time entry.

15. In order to find the right enterprise software provider to build and package a comprehensive software system to meet its needs, EFS sought bids and issued a Request for Proposal ("RFP").

16. Through the RFP process, multiple companies submitted a proposal and presented themselves as qualified and capable of creating a comprehensive, enterprise level single-platform system for EFS. IFS was one of these companies.

17. As part of the selection process, EFS requested that each candidate complete a questionnaire and rate their ability to deliver on each of EFS's requirements on a specified rubric, which ranged from a "0" (Functionality not provided) to a "4" (Functionality provided as standard). In the instructions that accompanied the rubric, it stated: "By answering a question affirmatively, the vendor agrees to support such capabilities within the product."

41687551.1/161568.00001

18. The questionnaire asked the bidding companies to use this rubric to rate themselves on 1,121 separate categories of specifications for EFS's system. EFS then weighted these categories based on whether they were considered "Required" or "Optional." IFS rated itself a "4" (the highest rating) on 1,022 of the 1,121 specifications, or approximately 91% of all specifications. Its raw average self-rating was 3.79 and its weighted average self-rating was 3.81, both of which were higher than the other bidding companies.

19. IFS also provided EFS with a quote of $648,400 for implementation and $285,000 for post-deployment support.

20. Based on the express representations made by IFS during the selection process regarding IFS's capabilities and pricing, EFS chose IFS to develop and implement EFS's needed software system.

21. On or about February 6, 2019, EFS and IFS entered into a Master Agreement (the "MSA"), which is attached hereto as **Exhibit A**.

22. Concurrently, EFS and IFS entered into a Managed Cloud Order Form, attached hereto as **Exhibit B**, and a Professional Services Order Form, attached hereto as **Exhibit C**.

23. Based on IFS's representations, EFS agreed to pay IFS steadily-increasing annual licensing and subscription fees. EFS agreed to pay IFS $544,249.00 for Year One (beginning on February 6, 2019); $1,088,499.00 for Year Two; and $1,814,165.00 for each of Year Three through Year Five.

24. In Paragraph 6.1.2 of the MSA, IFS provided the following warranty: "IFS warrants that the Professional Services will be performed in a professional manner by qualified personnel." "Professional Services" was defined in Paragraph 1.5 to mean "services provided by IFS to Licensee on a for fee basis pursuant to a Professional Services Order Form, whether they occur at Licensee's site, at IFS, through electronic media, or elsewhere. The most common Professional Services are training, consulting, installation, data conversions, and Customizations."

41687551.1/161568.00001

**IFS's Repeated Failures and Extortionary Conduct**

25. Early in the development process—before any of EFS's customers could be transferred to the IFS System—IFS admitted that it had underestimated the number of hours it was required to expend to build the IFS System and demanded that EFS agree to increase the hours paid for by EFS by 1,959 hours (a 57% increase), resulting in an additional $375,000 payment by EFS for development costs. This demand came despite no additional functions or business requirements being requested by EFS.

26. Approximately six months later, EFS began to transfer some of its smaller-sized customers to the new IFS System to see if it worked. However, it quickly became clear that IFS had not designed the IFS System with a proper understanding of EFS's business and customer base. As a result, there remained numerous open issues that EFS raised with IFS during weekly project meetings beginning in early 2021.

27. One particularly serious issue was a problem with the Tech Portal used by EFS's technicians. Specifically, horizontal and vertical scrolling functionality on tablets (*e.g.*, iPads) was inconsistent at best, and fully non-operational at worst. This made the Tech Portal completely unusable in instances where a high number of services were assigned to an individual technician. As was clearly communicated to IFS prior to entering into any contract, this use-case represented a major portion of EFS's business, and thus IFS's failure to provide a functioning Tech Portal substantially impacted EFS.

28. Another issue that arose was that the Tech Portal was not operational on smart phones (*e.g.*, iPhones). This was a critical issue, as the Tech Portal was the IFS recommended solution for the EFS requirement that their external subcontractors have access via smartphones.

29. IFS had specifically rated itself a "4" with respect to iPad and iPhone functionality, meaning that it had represented to EFS during the bidding stage that the "software fully supports the requirements" and "[n]o customization or work-around is required." This was obviously not the case. Further, it appears as though IFS made this representation to EFS without any factual basis or actual knowledge that it was true. Specifically, during a meeting between EFS and IFS

6

employees regarding the iPad scrolling issue, IFS admitted that it had previously had no customers that used the Tech Portal on an iPad, and thus it had never tested whether the Tech Portal would work on iPads.

30. While IFS was attempting to fix these issues, IFS once again demanded an additional payment from EFS to cover technical development costs. EFS vigorously disputed this additional payment request because the work proposed was well within the scope of IFS's original proposal and should have been covered by the substantial number of hours already granted to IFS. However, IFS refused to perform any work, including work on fixing the Tech Portal and other outstanding issues, unless EFS agreed to pay these new fees.

31. Given that the IFS System was in mid-development and already behind schedule for deployment, and EFS was under significant pressure because it had already told its customers that it would be implementing the IFS System as part of its future business plans that year, EFS agreed to pay IFS an additional $26,250.00 on July 8, 2021, followed by an additional $88,350.00 on August 9, 2021.

32. In addition to these added costs, IFS admitted that it did not have the technical knowhow to implement a Tech Portal usable by EFS's subcontractors via smartphone, and IFS informed EFS that IFS would need to subcontract out the Tech Portal work. IFS demanded that EFS pay IFS's subcontractor $165,000.00 to complete this critical work.

33. Further, IFS demanded an additional $107,062.50, which EFS paid on November 10, 2021.

34. The issues with the IFS System did not end with the Tech Portal. Another critical feature of the software is the ability to upload and manage customer information needed to create work orders (*i.e.*, tasks), dispatch technicians, and bill customers, amongst many other functionality requirements. Each customer location and all the various services offered to that customer by EFS needed to be loaded into the IFS system.

35. As part of the implementation process, IFS provided specific instructions around the framework required to effectively set up customer accounts in their system for EFS. This

framework ("contract line" creation) was utilized by IFS to set up the initial phases of customer accounts. These were single-site ("site based") accounts, which represented only a portion of the EFS portfolio of customers. Specifically, the IFS System would create "contract lines" in their system that included individual services provided at each location operated by one of EFS's customers.

36. During February 2022, while testing the IFS System, EFS discovered an issue which prevented it from uploading and posting the required data points (contract lines) for multi-site customers to the IFS System.

37. EFS immediately brought this to the attention of IFS. IFS responded that the issue was "a bug in the code." IFS also indicated that it may not be able to provide a workable solution—despite knowing from the outset that EFS's customer base mostly consisted of large, multi-site customers. Notably, IFS stated, "I had no clue your contracts would ever get this large…and this is the largest amount of lines on a contract that R&D has ever seen in 20 years."

38. This was the first time in the parties' three-year relationship that IFS suggested there would be any issues because of EFS's large service volume.

39. In addition, this latest contract line issue would prevent EFS from moving the majority of its customers to the IFS System. As a result, EFS was forced to renew its annual contracts with its legacy software providers at a cost of $1,372,000.00.

**Cure Notice and Contract Termination**

40. In late February 2022, senior leadership of EFS and IFS met to discuss the numerous failings of IFS. At this meeting, EFS explained that due to IFS's repeated failures, and the fact that EFS had already paid IFS *over 2 times* the amount IFS had originally quoted, EFS would not pay for further development related to features that were within the original scope of the project. Further, EFS informed IFS that going forward, EFS would be willing to compromise and only pay licensing subscription fees for its employees that were actually able to use any portion of the semi-functioning IFS System, which at no point was higher than 12 percent of the total licenses for which EFS was paying.

8

41. EFS followed up this meeting by sending a formal Cure Notice pursuant to Section 5.2 of the MSA, a copy of which is attached hereto as **Exhibit D**.

42. After the February 2022 meeting, IFS renewed its promises to EFS that it would solve the outstanding problems with the IFS System and provide a workable solution. Having invested several million dollars and three years of development into the IFS System, EFS continued to work in good faith with IFS to resolve the substantial issues with the IFS System.

43. Nevertheless, during this time, IFS began to pressure EFS to enter into a subscription renewal agreement. After multiple proposals and negotiations regarding the payment terms, EFS agreed to enter into a subscription renewal provided that IFS would warrant that it would provide EFS with a workable software solution. A copy of the Renewal Agreement is attached hereto as **Exhibit E**.

44. Although EFS continued to work in good faith with IFS to find a solution to the contract line issue, it ultimately became clear to EFS that IFS would be unable to provide it with a workable solution. To mitigate its damages, EFS sent a termination letter to IFS on November 11, 2022, pursuant to Section 5.2 of the MSA. A copy of the termination letter is attached hereto as **Exhibit F**.

45. Rather than accept that its software solution was non-functional, IFS sought to collect millions of dollars more in payment from EFS pursuant to the Renewal Agreement despite failing to provide a workable software solution to EFS.

## COUNT I: Fraudulent Inducement

46. EFS realleges and incorporates by reference each and every allegation set forth above as if set forth herein.

47. IFS made numerous false representations to EFS.

48. At the outset of its relationship with EFS, IFS misrepresented its tablet and smartphone functionalities during the RFP process when it rated itself as a "4," meaning that it had represented to EFS during the bidding stage that the "software fully supports the requirements" and "[n]o customization or work-around is required," in the questionnaire provided by EFS.

49. IFS further misrepresented to EFS its ability to correct the substantial issues with its system once they were identified, particularly when EFS and IFS were negotiating change orders and the subsequent subscription renewal.

50. IFS knew or believed these statements were false or made them in reckless disregard as to whether they were true or false. For example, as readily admitted by IFS, IFS previously had no customers that used the Tech Portal on an iPad, and thus it had not ever tested whether the Tech Portal would even work on an iPad.

51. IFS made these false representations to EFS in an attempt to first secure a contract with EFS to provide a software system overhaul for EFS's customers, and then to induce EFS to repeatedly pay additional sums to IFS via additional change orders and Renewal Agreement.

52. IFS's deceitful conduct described herein was willful, wanton, and malicious.

53. EFS reasonably and justifiably relied on these false representations from IFS in making its decision to enter into the MSA and the subsequent agreements.

54. As a direct result of its reliance on IFS's false representations, EFS has been damaged in an amount to be determined at trial. EFS is further entitled to rescind the MSA, subsequent change orders, and Renewal Agreement and recover at least all monies paid thereunder to IFS.

## COUNT II: Breach of Contract

55. EFS realleges and incorporates by reference each and every allegation set forth above as if set forth herein.

56. In the alternative to Count One for Fraudulent Inducement, EFS hereby alleges and asserts that IFS breached the MSA.

57. EFS and IFS entered into the MSA when they mutually consented to the agreement.

58. EFS did all of the things that the MSA required it to do.

59. IFS breached the MSA by wholly failing to provide a workable software solution for EFS and by failing to provide professional services as required by the MSA.

41687551.1/161568.00001

60. As a direct and proximate result of IFS's breach, EFS has been harmed in an amount according to proof at trial. IFS's breach was a substantial factor in causing EFS harm.

## COUNT III: Declaratory Relief

61. EFS realleges and incorporates by reference each and every allegation set forth above as if set forth herein.

62. An actual controversy has arisen and now exists between EFS and IFS with respect to whether EFS is obligated to pay IFS subscription fees under the Renewal Agreement despite IFS's failure to provide a functioning software system to EFS.

63. IFS contends that EFS is required to continue paying subscription fees under the Renewal Agreement, whereas EFS contends that it properly terminated the MSA and Renewal Agreement.

64. EFS requests a judicial determination of its rights pursuant to its contentions and a determination that EFS is not required to pay any subscription fees to IFS pursuant to the Renewal Agreement.

65. A judicial declaration is necessary at this time so to clarify the respective rights and obligations of EFS and IFS pursuant to the Renewal Agreement and the MSA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EMCOR Facilities Services, Inc. respectfully requests:

Count One for Fraudulent Inducement

A. Rescission of the MSA, subsequent change orders, and Renewal Agreement;

B. An award of damages to adequately compensate EFS for IFS's wrongful and fraudulent acts in an amount exceeding $75,000.00, such damages to be determined by a jury;

C. Punitive or exemplary damages;

41687551.1/161568.00001

Count Two for Breach of Contract

D. As an alternative to rescission of the MSA, an award of damages to adequately compensate EFS for IFS's breach of the MSA in an amount exceeding $75,000.00, such damages to be determined by a jury;

Count Three for Declaratory Relief

E. A judicial declaration that EFS is not obligated to pay any subscription fees to IFS under the Renewal Agreement;

All Counts and Causes of Action

F. An order awarding EFS attorneys' fees;

G. Costs and expenses in this action;

H. An award of prejudgment and post-judgment interest; and

I. Such other further relief, in law or equity, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff EMCOR Facilities Services, Inc. respectfully demands a trial by jury on all issues triable by jury.

41687551.1/161568.00001

Dated:  January 29, 2024              Respectfully submitted,

By: /s/<u>Barry P. Kaltenbach</u>

Barry P. Kaltenbach (ARDC 6270034)
**MILLER, CANFIELD, PADDOCK & STONE, P.L.C.**
227 W. Monroe, Suite 3600
Chicago, IL 60606
Telephone: 312.460.4200
kaltenbach@millercanfield.com

David J. Tsai (*pro hac vice* forthcoming)
Alekzandir Morton (*pro hac vice* forthcoming)
John Steger (*pro hac vice* forthcoming)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, CA  94111-5998
Telephone:  415.983.1000
Facsimile:  415.983.1200
david.tsai@pillsburylaw.com

Attorneys for Plaintiff

41687551.1/161568.00001